JASON M. FRIERSON
United States Attorney
Nevada Bar No. 7709
EDWARD VERONDA
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Telephone: (702) 388-6336
Email: Edward.G.Veronda@usdoj.gov
*Attorneys for the United States of America*

FILED
U.S. MAGISTRATE JUDGE

DATE: March 30, 2023

TIME: 11:00 a.m.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-mj-00259-EJY |
| Plaintiff, | **CRIMINAL COMPLAINT** |
| v. | for violation of: |
| JOSEPH LYNN SALES, | Conspiracy to Commit Interstate Transportation of Stolen Property |
| Defendant. | (18 U.S.C. §§ 371, 2314) |

BEFORE the Honorable Elayna J. Youchah, United States Magistrate Judge, Las Vegas, Nevada, the undersigned Complainant, being duly sworn, deposes and states:

COUNT ONE
Conspiracy to Commit Interstate Transportation of Stolen Property
(18 U.S.C. §§ 371, 2314)

1. Beginning on a date unknown, but no later than in or about August 2022, and continuing up to and including a date unknown, but no earlier than March 23, 2023, in the State and Federal District of Nevada,

JOSEPH LYNN SALES (SALES),

defendant herein, and others known and unknown, knowingly combined, conspired, confederated, and agreed with each other, to commit an offense against the United States,

that is, Interstate Transportation of Stolen Property, in violation of 18 U.S.C. § 2314, in violation of 18 U.S.C. § 371.

      2.      In furtherance of the conspiracy and to carry out its object, defendants performed, or caused to be performed, the following overt act, among others: on or about August 15, 2022, in Las Vegas, Nevada, SALES and a co-conspirator ("INDIVIDUAL 1") purchased eleven catalytic converters from FBI confidential human sources for approximately $2,200 in cash.

## PROBABLE CAUSE

Complainant, Matthew Schwartz, states the following as and for probable cause.

      3.      I am currently assigned to the FBI Las Vegas, Nevada, Field Office, Transnational Organized Crime, Squad 3. As part of my FBI duties, I investigate criminal violations of Interstate Theft. Through the FBI, I have received specialized training in the enforcement of federal theft laws. My training and experience has involved, among other things: (a) the debriefing of defendants, witnesses, informants, as well as others who have knowledge of the laundering and concealment of proceeds from the sale of stolen items; (b) surveillance; (c) analysis of documentary and physical evidence; (d) the hand-to-hand sale of purported stolen items; and (e) the execution of search warrants.

      4.      I have also received training in investigations involving the interception of wire communications at the FBI Academy at Quantico, Virginia.  During my tenure with the FBI, I have either investigated or assisted in the investigation of money laundering cases ranging in scope from street-level distributors to multi-state and international complex conspiracy cases.

      5.      Based on my training and experience as an FBI agent, I am familiar with the manner in which money launderers conduct their theft related businesses, including:  the

methods employed by businesses to attempt to mask their financial activity, their use of digital and social media in furtherance of their illegal activities and their use of coded language to refer to stolen items, counter-surveillance, other aspects of money laundering, conspiracy, and other crimes.

6. I have been involved in the investigation, which is the subject of this Affidavit. Due to my personal participation in this investigation and reports made to me and the investigative team by other FBI Agents, and other Law Enforcement Officers, I am familiar with all of the facts and circumstances stated herein. My training and experience as a Special Agent, including participation in this investigation, form the basis for opinions and conclusions set forth below.

7. This summary is provided for purposes of demonstrating that there is probable cause to believe that the defendants have committed the crimes described above.

8. Company A is a Nevada business that advertises that it repairs catalytic converters. The investigation to date, including evidence gathered through confidential human sources, surveillance, and financial records, has established probable cause that Company B representatives, including INDIVIDUAL 1, purchase stolen catalytic converters from criminals who have cut them from vehicles

9. Company B is a Nevada business that advertises that it purchases and recycles catalytic converters. The investigation to date, including evidence gathered through confidential human sources, surveillance, and financial records, has established probable cause that Company A representatives, including SALES, purchase stolen catalytic converters from criminals who have cut them from vehicles.

    10.    Through controlled sales described below, SALES and INDIVIDUAL 1 have purchased (on behalf of Company A and B) catalytic converters that the sellers represented were stolen.

    11.    The first controlled sale of catalytic converters took place on August 15, 2022, where two FBI Confidential Human Sources, CHS-1[1] and CHS-2 [2] met with INDIVIDUAL 1 and a male later identified as SALES at Company A's business address in Las Vegas, Nevada. CHS-1 and CHS-2 met with INDIVIDUAL 1 and SALES, as well as one other employee associated with Company B. During the meeting, the CHSs sold 11 catalytic converters to SALES for $2,200. SALES paid INDIVIDUAL 1 with a check for the catalytic converters. INDIVIDUAL 1 then drove the CHSs to a Bank of America branch nearby and paid the CHSs using cash. The meeting was audio and video recorded.

    12.    I reviewed the audio and visual recording of the meeting between the CHS-1, CHS-2, INDIVIDUAL 1 and SALES. The following is a summary of what was said and is not verbatim. Most of the meeting took place in Spanish, the following contains a translation of the meeting. During the meeting, the CHSs discussed the catalytic converters that the CHSs had brought with them. INDIVIDUAL 1 warns the CHSs "to be very

---

[1] CHS-1 has worked with the FBI since March 2019 and is known to be credible and reliable. CHS-1 is a convicted felon with a history of violence, theft, drug use, possession of a weapon, fraud, traffic violations, and failure to appear. CHS-1's criminal activity preceded his/her work with the FBI. CHS-1 is working for monetary compensation.

[2] CHS-2 has worked with the FBI since December 2014 for monetary gain. Since that date, CHS has worked with the FBI on numerous investigations for drug trafficking and is known to be credible and reliable. CHS-2 is receiving immigration related benefits against deportation due to continued cooperation with law enforcement. CHS-2 is a convicted felon with a history which includes charges for False Claim of US Citizenship; Illegal Entry (Into United States); Re-entry After Deportation; Probation Violation; Burglary 3rd Degree; Theft, Marijuana – Possess for Sale; Conspiracy; Money Laundering 2nd Degree; Illegal Control of Enterprise; Possess/Use Weapon Drug Offense; Drug Paraphernalia Violation; Marijuana Violation and various traffic offenses.

careful with those, as he could get 25 years in jail." INDIVIDUAL 1 reviews the codes that are on the catalytic converts and sends them to his point of contact who he says is from Texas. CHS-1 states, "he and his homies only want to get them during the night which is less suspicious." CHS-1 informs INDIVIDUAL 1 that he wants to be paid in cash. INDIVIDUAL 1 suggests to the CHSs they should drive carefully, and hide those items in the small back cabin or underneath the seats. INDIVIDUAL 1 states "that there is an ongoing investigation throughout the country and police may stop them." Based on my training and experience, the use of the term "get them during the night which is less suspicious" under these circumstances would convey that the catalytic converters were obtained through theft.

13. The second controlled sale of catalytic converters took place on August 17, 2022, where CHS-1 and CHS-2 met with INDIVIDUAL 1 and SALES at Company A's business address in Las Vegas, Nevada. During the meeting, the CHSs sold 23 catalytic converters to SALES for $12,600. SALES paid INDIVIDUAL 1 with a check for the catalytic converters. INDIVIDUAL 1 paid the CHSs $3,000 in cash and told the CHSs that he was going to keep approximately $4,200 as part of his portion for brokering the deal between the CHSs and a person/company that would buy their reported stolen catalytic converters.

14. I reviewed the audio and visual recording of the meeting between the CHS-1, CHS-2, INDIVIDUAL 1 and SALES. The following is a summary of what was said and is not verbatim. Most of the meeting took place in Spanish, the following contains a translation of the meeting. During the meeting, INDIVIDUAL 1 thanks the CHSs for their work and sacrifice, and states, "he does not see anything bad doing it like dealing drugs or other crime." The catalytic converters were purportedly stolen during the meeting that took

place on August 15th, where the CHS informed INDIVIDUAL 1 that the CHS "get them during the night which is less suspicious." INDIVIDUAL 1's suggestion to the CHS to be cautious when driving around with the catalytic converters solidify INDIVIDUAL 1's knowledge of how the CHSs reportedly obtained the catalytic converters through theft.

15. The third controlled sale of catalytic converters took place on September 27, 2022, between CHS-1 and SALES at Company B's business address in North Las Vegas, Nevada. During the meeting CHS-1 sold 14 catalytic converters to SALES. During the meeting SALES informed CHS-1 that he would need the business license for the CHS's business and a new vendor form before he could pay the CHS-1. CHS-1 and SALES discussed how the CHS's "homies" had just gotten the catalytic converters from California. The CHS inquired if Company B's location in California cared if the catalytic converters are stolen. I believe that SALES shakes his head no because the CHS verbally responds "no" as confirmation. SALES states that as far as caring he probably cares the least. SALES states that "he don't know nothing," and that California may not want them if they know they are stolen. SALES states that he won't ever say no, and that he does not care.

16. I reviewed the audio and visual recording of the meeting between the CHS-1 and SALES. The following is a summary of what was said and is not verbatim:

CHS-1: These are from California. My homies got them over there….Can you send me with someone from Cali over there?

SALES: You would have to bring it to them…it's appointment only….

CHS-1: Do they care? Do they care if they are fucking stolen?...No.

SALES: As far as caring, I probably care the least.

SALES: I don't know nothing. Other people don't do it like that…so I wouldn't sell to them if you had the choice. Because they may be like oh I don't want them, if they think they are stolen. I am never not going to want them…I personally don't care.

17. On October 6, 2022, the CHS had a phone call with SALES where SALES informed the CHS that the CHS would need a business license that had something with automotive in the name. On November 9, 2022, CHS-1 returned to Company B to meet with SALES and provided the business license for an FBI created company with automotive in the name ("the FBI company"), as well as the new vendor form that had been given to CHS-1 on September 27, 2022. CHS-1 received a check made payable to the FBI company for $5,558. The meeting was audio and video recorded.

18. The fourth controlled sale of catalytic converters took place on November 17, 2022, between CHS-1 and SALES at Company B's business address in North Las Vegas, Nevada. During the meeting the CHS sold 32 catalytic converters to SALES. The CHS received a check made payable to the FBI company for $6,280. The meeting was audio and video recorded.

19. The following is a summary of what was said and is not verbatim. During the meetings the CHS informs SALES that he/she went to Los Angeles the day before and that the CHS's cousin had a lot of catalytic converters and was having a problem getting rid of them. The CHS inquired if there was a way to get the catalytic converters out to Company B in Las Vegas or if there was a place in California the CHS's cousin could go. SALES tells the CHS about a Company B location in Irvine, California that should be able to help the CHS's cousin out as long as the CHS's family member had a business set up.

20. The fifth controlled sale of catalytic converters took place on January 12, 2023, between CHS-1 and SALES at Company B's business address in North Las Vegas,

Nevada. During the meeting the CHS sold 21 catalytic converters to SALES. The CHS received a check made payable to the FBI company for $3,923. The meeting was audio and video recorded.

21. The following is a summary of what was said and is not verbatim. During the meeting, CHS-1 inquires about wanting to expand their business to other locations, and if SALES could help CHS-1 out with this. SALES informs CHS-1 that if the catalytic converters appear to be stolen, that the other companies will probably not buy them, and if the company does not purchase them because they are stolen, the company will not deal with that company for forever. SALES goes on to state that that is all he can say.

22. On March 23, 2023, CHS-2 placed a call to INDIVIDUAL 1. The call was audio recorded and took place in Spanish, the following contains a translation of the meeting. CHS-2 asked INDIVIDUAL 1 if he was still interested in catalytic converters. INDIVIDUAL 1 said yes, and that every time he gets one, he sells it. He could sell them the next day.

23. Based on the above, I believe there is probable cause that JOSEPH LYNN SALES, did violate 18 U.S.C. § 371 (Conspiracy to Commit Interstate Transportation of Stolen Property).

Matthew Schwartz, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on March  30  , 2023

HONORABLE ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE